# EXHIBIT A

Menu                                                                    Explore

# Science-Based Medicine

Exploring issues & controversies in science & medicine

Lyme      Politics and Regulation

# "Chronic Lyme" VIP Daniel Cameron disciplined by New York medical authorities

"Chronic Lyme" guru Daniel Cameron, MD, has been put on 3-year probation by New York medical authorities. Will fellow "Lyme literate" doctors take note?

Jann Bellamy on June 22, 2017



The medical practice of "Lyme literate" guru Daniel Cameron, MD, will be closely supervised by the authorities during a three-year probation imposed last week by the New York State Board for Professional Medical Conduct (BPMC). The order was based on professional misconduct charges filed against Cameron earlier this year.

Cameron agreed to the imposition of sanctions during administrative proceedings on the charges and a consent order was entered by the BPMC based on his concession. He stipulated that

> " he could not successfully defend against at least one of the acts of misconduct alleged. Those allegations included practicing the profession of medicine with negligence on more than one occasion, incompetence on more than one

occasion, gross negligence, gross incompetence, and/or failing to maintain accurate patient medical records.

# Who is Daniel Cameron, MD?

Cameron is a solo practitioner in Mt. Kisco, NY, and board certified in internal medicine, but not fellowship-trained in infectious diseases and not board-certified in that sub-specialty. He also holds an MPH and describes himself as epidemiologist. According to his website, he:

> " is a nationally recognized leader for his expertise in the diagnosis and treatment of Lyme disease and other tick-borne illnesses.

That is partially true. He is a "recognized leader" among those who consider "chronic Lyme" a real disease and who treat it with long-term antibiotics, sometimes for months to years. He is not a "recognized leader" among board-certified infectious diseases doctors and other experts who agree that "chronic Lyme" is not a real disease and who rely on well-conducted trials showing that long-term antibiotics do not substantially improve the outcome for patients diagnosed with so-called "chronic Lyme." Long-term antibiotics can, in fact, result in serious harm, including death, a subject our good friend Orac covered just yesterday over on Respectful Insolence. The CDC, the Infectious Diseases Society of America (IDSA), the American Academy of Pediatrics, the American College of Physicians, the *Medical Letter* and the American Academy of Neurology all reject the notion that "chronic Lyme" exists and that long-term antibiotics are an appropriate treatment.

(Orac's post nicely summarizes the differences between real Lyme disease and "chronic Lyme," "a prototypical fake medical diagnosis," and the dangers of long-term antibiotics, as have posts on SBM, here, here, here, and here.)

That has not stopped "Lyme literate" doctors from banding together to form the International Lyme and Associated Diseases Society (ILADS) and issuing their own guidelines for the diagnosis and treatment of "chronic Lyme," guidelines based on very low levels of evidence that are accepted only by themselves and, in contrast to the IDSA guidelines, no other professional medical organization. ILADS teaches physicians and other practitioners how to become "Lyme literate," although there is precious little information about the courses on the ILADS website. ILADS, again in contrast to IDSA, is not an ACCME-accredited provider of continuing medical education and, to my knowledge, none of its courses qualify for continuing medical education credit. Nor are ILADS guidelines taught as appropriate in any medical school, residency or fellowship program.

Unfortunately, according to Cameron,

> ILADS healthcare providers currently serve more than 100,000 patients with Lyme and associated tick-borne diseases in the USA and around the world.

Cameron is a leading light among the "Lyme literate." He is the past president of ILADS and is the lead author of both the original ILADS guidelines and its 2014 update. He has testified before several state legislatures promoting the protection of "Lyme literate" doctors from prosecution by state medical boards, including the legislature in New York, where such a bill became law. He also makes presentations to Lyme support groups, spreading the gospel of "chronic Lyme."

He has written a number of articles in the medical literature promoting the notion that "chronic Lyme" exists and that long-term antibiotics are an appropriate treatment, including two in the bottom-feeder journal, *Medical Hypotheses*, known for its publication of pseudoscientific papers.

His bibliography includes a letter to the editor of the *New England Journal of Medicine*, complaining about an article by infectious diseases experts rejecting "chronic Lyme" as a valid diagnosis and its "treatment" with long-term antibiotics. The evidence, Cameron claimed, is actually in "clinical equipoise." This drew a sharp rebuke from the article's authors:

> " The term 'clinical equipoise,' used by Cameron, is difficult to justify in view of the published reports of five double-blind, randomized, placebo-controlled clinical trials that have convincingly demonstrated that antibiotic treatment of post–Lyme disease symptoms is not in the best interests of patients. Our article summarizes the consensus among clinicians who practice evidence-based medicine . . .

The direct implication being, of course, that Cameron is not one "among clinicians who practice evidence-based medicine."

Cameron, for his part, brushes off the expert opinion of infectious diseases doctors versus "chronic Lyme" pseudoscience manufactroversy as simply "different points of view:"

> " Only by airing these different points of view will the medical and scientific community reach a better understanding of controversial topics such as treatment of chronic Lyme disease. Meanwhile, physicians must be able to exercise their clinical judgment and patients should be provided with treatment options.

With that, let's turn to how, in the view of the New York state medical authorities, Cameron exercised his "clinical judgment" and provided patients with "treatment options."

# "Clinical judgment" and "treatment options"

Apparently, New York's medical misconduct procedures do not require the physician charged to stipulate to any particular acts of misconduct as a condition of settling his case. Rather, as noted, Cameron simply stated he was unable to "successfully defend against at least one of the acts of misconduct alleged" and agreed to the imposition of sanctions. This means the allegations in the state's Statement of Charges were never proven, as it was unnecessary to reach a decision on the factual issues once Cameron decided to settle. However, per the Office of Professional Medical Conduct's (OPMC) standard procedures, the allegations in the Statement of Charges were based on expert review of Cameron's patients' records and they remain uncontested by Cameron.

The state's allegations were based on Cameron's care of seven patients. According to the Statement of Charges, some of his more egregious actions include:

- Continuing to prescribe narcotics to a patient diagnosed with bipolar disorder and narcotic abuse for two years after the patient had moved to another state.

- Failing to follow up on previous diagnostic tests and symptoms indicative of multiple sclerosis, "thereby depriving the patient of an accurate diagnosis and years of effective therapy for her progressive disease."

- Failing to appropriately and timely evaluate a patient, who suffered from Parkinson's disease, when she complained of pain associated with a PICC line inserted at Cameron's direction for parenteral antibiotics, which itself was done without an appropriate physical examination or "clinical re-assessments for consideration of any alternative diagnoses and/or treatment."

- Failing to consider "other infections or inflammatory processes" in a patient with a recent termination of pregnancy and diverticulitis, who had abnormal lab results, including abnormal liver function tests and an elevated sedimentation rate, and failure to order a CT scan of the abdomen and pelvis as well as additional blood testing.

The state wisely avoided specifically challenging Cameron's diagnosis of his patients with "chronic Lyme" or his treating "chronic Lyme" with long-term antibiotics. In fact, the term is never mentioned. In doing so, it circumvented the quagmire of arguing over "different points of view" and concentrated on the fact that Cameron quite simply failed his patients by giving them substandard care, "chronic Lyme" or no "chronic Lyme." This strategy also avoided any shield which might have been provided by New York's foolish law aimed at protecting "Lyme literate" doctors.

Yet the fingerprints of "chronic Lyme" diagnosis and treatment show through loud and clear in the state's case. For each and every patient, Cameron was charged with:

- Repeatedly failing to take and/or note an adequate history of present illness.

- Repeatedly failing to perform and/or note an appropriate physical examination.

- Failing to appropriately construct a differential diagnosis and pursue a through diagnostic evaluation.

- Failing to maintain records accurately reflecting care and treatment rendered to the patient.

For six of the seven, he was charged with:

" Treating patients inappropriately with an ongoing and escalating antibiotic regimen without appropriate sequential physical examinations and clinical reassessments for consideration of any alternative diagnoses and/or treatment.

And for four of them, according to the state, Cameron failed to follow up in a timely fashion when the patient developed possible adverse reactions to therapy.

Two of the patients who presented with complaints of fatigue and pain had previous diagnoses and treatment for Lyme disease, 9 and 16 years earlier, fitting the "Lyme literate" notion that their current complaints are most certainly sequelae to inadequately-treated Lyme and cannot be attributed to other causes.

Reading between the lines, Cameron had only one tool, a hammer, so he saw every problem as a nail. The possibility that the patient might be suffering from

something other than "chronic Lyme" was tossed aside via inadequate physical exams and medical records, failing to consider other diagnoses, and bulldozing ahead with inappropriate long-term antibiotics, adverse consequences be damned.

Of course, if you think about it, substandard care and "Lyme literacy" would appear to go hand-in-hand. It is hard to imagine the "Lyme literate" doctor, who routinely ignores medical science in favor of unvalidated testing, makes repeated diagnoses of a fake disease, and orders unwarranted long-term antibiotics, otherwise delivering standard-of-care medical practice. As with the Cameron case, this offers a way forward to state medical boards hamstrung by laws designed to protect the misconduct that is "chronic Lyme" from disciplinary action.

# Terms of three-year probation

In entering into his probationary period, Cameron is in the company of other "Lyme literate" doctors who have had their medical practices questioned by their peers, up to and including discipline imposed by medical regulators (also, here and here).

Hopefully, Cameron will be hard-pressed to continue his usual M.O. under the terms of the Board's Consent Order. He has agreed to practice medicine only when monitored by a licensed physician (a "practice monitor") who must be "board certified in an appropriate specialty considering [Cameron's] specialty of practice, who is familiar with the diagnostic and treatment modalities practiced and offered by [him]."

The practice monitor can see all of Cameron's records and must visit his office "on a random unannounced basis at least monthly" and examine no fewer than 20 records. The monitor's review is to determine whether Cameron's medical practice "is prudent and competent." Any perceived deviation from prudent care or refusal to cooperate must be reported to the OPMC within 24 hours. The monitor must also report to the OPMC quarterly and Cameron must pay the expenses of monitoring.

Cameron gets to propose his own monitor to the OPMC. This, coupled with the language about familiarity with Cameron's "diagnostic and treatment modalities," leaves some concern that a fellow traveler would be put in charge. The fact that the OPMC must approve the monitor, plus the broad authority given to the OPMC in the Consent Order to look at his records and otherwise investigate what he is up to, somewhat allays those concerns.

He must also, among other things:

- Obtain written informed consent from each patient "specifically addressing all aspects of treatment" and provide the OPMC with copies of his consent forms.

- Fully document all discussions with patients concerning his evaluation and treatment "and of the patient's need to pursue conventional medical care elsewhere, if indicated." This is of some concern as well, as it implies Cameron is free to provide *un*conventional medical care as long as he tells the patient she needs the conventional kind.

- Obtain and review medical records from physicians who previously or are currently treating his patients and refer patients to other physicians for further evaluation and treatment "where medically warranted and beyond the scope of [Cameron's] role with regard to the patient."

- Maintain at least $2 million per occurrence/$6 million per policy year limit medical malpractice insurance.

- Complete CME courses as directed by OPMC.

# But, Legislative Alchemy

Whether Cameron's case will prove to be a cautionary tale for other "Lyme literate" doctors remains to be seen. Even as one branch of state government successfully prosecutes a "Lyme literate" doctor, another branch, the legislature, is considering forcing insurers to cover treatment of "chronic Lyme," the subject of no less than three bills now pending. (Assembly Bill 114, Senate Bill 4713, Senate Bill 670). Three other bills are sympathetic to the cause in that they will give "chronic Lyme" advocates yet another venue to argue for insurance coverage. (Assembly Bill 4863, Senate Bill 2168, Assembly Bill 6927). Pseudoscience, it seems, is endemic in the state of New York.

**Posted in:** Lyme, Politics and Regulation     **Tagged in:** chronic Lyme disease, Daniel Cameron, Lyme-literate MDs, new york

### Posted by Jann Bellamy

Jann J. Bellamy is a Florida attorney and lives in Tallahassee. She is one of the founders and Board members of the Society for Science-Based Medicine (SfSBM) dedicated to providing accurate information about CAM and advocating for state and federal laws that incorporate a science-based standard for all health care practitioners. She tracks state and federal bills that would allow pseudoscience in health care for the SfSBM website.  Her posts are archived here.

All Posts   Website

Comments for this thread are now closed                                    ✕

**673 Comments**        Science-Based Medicine                   Login ▾

♡ Recommend  **14**          🐦 Tweet        f Share              Sort by Best ▾

  **Alden Zane** • a year ago
I agree with much regarding the condemnation of TREATMENT protocols for what
is labeled chronic lyme. However as one who was infected by a tick in 1969,in
California, and had classic symptoms with 'bulls eye' rash, fever, joint pain etc and
wasn't diagnosed properly for 20 + years and then had great difficulty getting
treatment; I know there is such a factor as 'post Lyme' for those who suffered
decades without even recognition of the causation or the necessary protocols for
dealing with this particular circumstance.Who knows how many there are who
experienced the same? Eventually I had to seek treatment out of country and
suffered through decades of difficulties hard to even describe. Today there is a
community of support and much info regarding 'Lyme' and other tick born
diseases but it took a long time to sort through the science and pseudo science to
get a grip on the causation and the necessary treatment protocols. The damage
done over decades has left its mark in ways I don't even attempt to communicate
to those unfamiliar with this particular circumstance. I believe there were many
like me who were miss diagnosed and were left untreated and or suffered through
improper treatment protocols. It is rarely addressed. I sympathize with those who
have struggled with the complexity of diagnoses and treatment of the long term
effects of those who did not get proper treatment; some who suffered for decades.
Many of us who survived this will not get a full diagnoses of the damage until
autopsy.

7 ∧   ∨ • Share ›

  **WLU**  Moderator  → Alden Zane • a year ago
The problem is, any post-Lyme syndrome sufferers and the condition itself,
is almost irrevocably polluted by the activities, advocacy, and CAM-
pushing nonsense of chronic "Lyme" disease patients who have never
shown any evidence of being infected with Lyme disease, ever, yet still
demand to be put into the same group as you.

7 ∧   ∨ • Share ›

  **mouse** → WLU • a year ago
WLU, how you manage to assign blame for "polluters" without



Join The Society for SBM 

Buy an e-book:

- SBM e-Books for Kindle

- SBM e-Books for iBooks

- SBM e-Books for Nook

Dr. Hall's video SBM course

## Categories

- Acupuncture

- Announcements

- Basic Science

- Book & movie reviews

- Cancer

- Chiropractic

- Clinical Trials

- Computers & Internet

- Critical Thinking

- Dentistry

- Energy Medicine

- Epidemiology

- Evolution

- Faith Healing & Spirituality

- Health Fraud

- Herbs & Supplements

- History

- Homeopathy

- Humor

- Legal

- Medical Academia

- Medical Ethics

- Naturopathy

- Neuroscience/Mental Health

- Nutrition

- Obstetrics & gynecology

- Ophthalmology

- Pharmaceuticals

- Politics and Regulation

- Public Health

- Religion

- Science and Medicine

- Science and the Media

- Surgical Procedures

- Traditional Chinese Medicine

- Vaccines

- Veterinary medicine

## Recent Comments

View all recent comments

- avalpert

  Crystal Pepsi - the commercial featured Van Halen. It wasn't a dismal failure initially but was sabotaged by Coke releasing a clear version of Tab to associate clear soda with cheap knock-offs....

  Update on Low Calorie Sweeteners · 12 minutes ago

- DevoutCatalyst

  Caffeine free diet Mountain Dew is a thing. Denatured. Tastes great, less fulfilling.

  Update on Low Calorie Sweeteners · 15 minutes ago

- megsaint

  I remember when I was a kid that sugar was cheaper in Canada than in the U.S and my mother telling me that it was because in Canada, we could buy sugar produced in Cuba but, in the U.S., we couldn't.

  Update on Low Calorie Sweeteners · 25 minutes ago



- megsaint

Interesting. Didn't either Coke or Pepsi make a clear cola? Wasn't it a dismal failure?

Update on Low Calorie Sweeteners · 27 minutes ago



- megsaint

I'll have to check them out. Thanks!

Update on Low Calorie Sweeteners · 30 minutes ago

View all recent comments

## Donate to support science!

If you prefer to make a one time donation, please use the link below

Donate

Next

# Coconut Oil Warning

June 21, 2017

Previous

# So Long and Thanks for All the SCAM

June 23, 2017



DISCORD

Development by Digital Gravity Media | © 2018 Paperback Theme by Array.