UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

DANIEL CAMERON, M.D.,  :  Case No:  7:18-cv-10395 (VB)
 :
       Plaintiff,  :  **MEMORANDUM IN SUPPORT OF**
 :  **SPECIAL MOTION TO DISMISS AND**
  v.  :  **MOTION TO DISMISS PURSUANT TO**
 :  **FED. R. CIV. P. 12(B)(6)**
JANN BELLAMY; DAVID H. GORSKI,  :
M.D.; STEVEN NOVELLA, M.D.;  :
KIMBALL C. ATWOOD, IV, M.D.;  :
HARRIET HALL, M.D.; and MARK  :
CRISLIP, M.D.,  :
 :
      Defendants.  :

-------------------------------------------------------x

1    <u>**MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO DISMISS AND MOTION**</u>

2    <u>**TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**</u>

3    Dr. Cameron filed a belated complaint seeking to suppress reporting about the

4    disciplinary action taken against him by the State of New York.  Ms. Bellamy wrote the article.

5    However, Dr. Cameron filed a scattershot complaint against everyone he could find that had any

6    connection to Science-Based Medicine, the website where Ms. Bellamy published her article.

7    Dr. Novella had nothing to do with the article, and thus has no liability.

8    Even as to the author, Dr. Cameron's complaint should be dismissed as a matter of law

9    as a fair report.  However, when it comes to the secondary defendants, such as Dr. Novella, it is

10   doubly unsupportable.  As Dr. Novella is a Connecticut citizen and resident, the complaint is

11   subject to the Connecticut anti-SLAPP law.[1]  All claims should be dismissed pursuant to the

12   Connecticut anti-SLAPP law and under Fed. R. Civ. P. 12(b)(6).

13   **1.0   FACTUAL BACKGROUND**

14   On June 22, 2017, Jann Bellamy published an article on *Science Based Medicine*.  The

15   article was titled   *"Chronic Lyme" VIP Daniel Cameron disciplined by New York medical*

16   *authorities  See* https://sciencebasedmedicine.org/chronic-lyme-vip-daniel-cameron-disciplined-

17   by-new-york-medical-authorities/, reprinted at Complaint, Exhibit A, Dkt. No. 1-1 ("Cameron

18   Article"); Complaint, Dkt. No. 1 at ¶ 17.  "Lyme disease is an infection that ordinarily responds

19   well to conventional antibiotic therapy. … The diagnosis of 'chronic Lyme disease' is

20   controversial among medical specialists." *Konspore v. Friends of Animals, Inc.*, 2010 U.S. Dist.

21   LEXIS 77705, at *1 n.1 (D. Conn. Aug. 2, 2010) citing Feder, et al., *A Critical Appraisal of*

22   *"Chronic Lyme Disease"*, 357 NEW ENG. J. MED. 1422, 1422 (2007).[2]

23

---

24   [1] Dr. Cameron claims that Florida law should apply to this action.  If the court agrees, then the Florida anti-SLAPP
     law should apply.

25   [2] A copy of that article is attached as Exhibit 1.  The Court may take judicial notice of peer-reviewed scientific
     publications.  *See Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski*, 899 F.2d 151, 161 (2d Cir. 1990).

26

27                                                    - 1 -

28

The Cameron Article cited a June 15, 2017 Consent Order entered into between Plaintiff, Dr. Daniel Cameron, and the New York, Department of Health, Board for Professional Medical Conduct, BPMC No. 17-169. *See* Dkt. No. 1-1 linking to https://apps.health.ny.gov/pubdoh/professionals/doctors/conduct/factions/PhysicianDetailsActio n.action?finalActionId=8470; *see* also Complaint at ¶ 27. A copy of that Consent Order appears at Exhibit 2.[3] It entered one week after Dr. Cameron unsuccessfully sought to have this Court enjoin the proceedings. *See Cameron v. Zucker*, No. 17-cv-3420 (JGK), 2017 U.S. Dist. LEXIS 87229 (S.D.N.Y. June 6, 2017); *see also Matter of Cameron v. Shah*, 140 A.D.3d 439, 31 N.Y.S.3d 867 (App. Div. 2016) (denying Article 78 petition to prohibit disciplinary action) *leave to appeal denied* 28 N.Y. 3d 914 (2017).

### 1.1   Dr. Cameron is Disciplined by New York for Improperly Treating Patients He Presumes to Have Lyme Disease Without Sufficient Basis

The Consent Order adopted terms of a Consent Agreement executed by Dr. Cameron that same day. *See* Exhibit 2 at 2. In that Agreement, Dr. Cameron "assert[ed] that [he] cannot successfully defend against at least one of the acts of misconduct alleged" in the Statement of Charges incorporated into the Consent Agreement. *Id.* at 3. Notably, Dr. Cameron **previously conceded to this Court** "that the ILADS guidelines do not allow or advise the conduct alleged in the Statement of Charges." *Cameron v. Zucker,* No. 17-cv-3420 (JGK), 2017 U.S. Dist. LEXIS 87229, at *20 (S.D.N.Y. June 6, 2017). Those are the guidelines under which Dr. Cameron practiced. *Id.* at *10-13.

Dr. Cameron was charged with "Negligence on More than One Occasion";

---

[3] In considering a motion to dismiss under Rule 12(b)(6), the court matters of which judicial notice may be taken pursuant to Fed. R. Civ. P. 10(c). *See Thomas v. Westchester Cty. Health Care Corp*., 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) citing *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Among the items subject to judicial notice are decisions of an administrative agency. *See id.* at 276.

"Incompetence on More than One Occasion"; seven instances of "Gross Negligence"; "Gross Incompetence"; and "Failure to Maintain Records."   Exhibit 2 at 14-26.   As this Court previously summarized:

> The Statement of Charges against Dr. Cameron includes allegations regarding the care and treatment of seven of Dr. Cameron's patients. In particular, it charges Dr. Cameron with negligence, incompetence, gross negligence, and gross incompetence in the practice of medicine, and with failure to maintain medical records. …
> [T]he Statement of Charges accuses Dr. Cameron of deviating from minimally accepted standards of care that apply to all doctors and that apply regardless of whether the patient at issue is being treated for Lyme disease in accordance with ILADS guidelines or not. For example, Dr. Cameron is alleged to have continued to provide narcotics to a patient who had a diagnosis of bipolar disorder/personality disorder and narcotics abuse from July 2003 through 2005 even though the patient had moved to Florida. In another case, the Statement of Charges allege that, over the course of ten years, the plaintiff treated a patient with an "ongoing and escalating antibiotic regimen" although the patient received only one physical examination during those ten years. The charges accuse the plaintiff of failures such as the failure to take and note an adequate history, failure to perform an appropriate physical examination, prescription of medication without appropriate medical indications, failure to follow up when the patient experienced adverse reactions to the administered therapy, and failure to maintain adequate records.

> This is only a sampling of the charges.

*Zucker, supra*, at *10, 19-20 (internal citations omitted).   Common to his patients, the Board charged he failed to "appropriately construct a differential diagnosis" or consider alternate diagnoses, treating all with antibiotics.   Exhibit A at 15-22.   "Dr. Cameron's practice consists primarily of patients seeking treatment for Lyme disease." *Zucker, supra* at *22.   This Court has, itself, upheld denials of benefits to patients of Dr. Cameron.   *See Schnur v. Ctc Communs. Corp. Grp. Disability Plan*, 2010 U.S. Dist. LEXIS 31282 (S.D.N.Y. Mar. 29, 2010)(denying long-term disability benefits); *Bergquist v. Aetna*, 289 F. Supp. 2d 400 (S.D.N.Y. 2003) (same).

Among the agreed sanctions was a three-year probation and that he a) "communicate fully to the patient" his particular role "whether or not universally accepted treatment modalities are contemplated"; b) "Obtain written informed consent specifically addressing all aspects of treatment modalities"; and c) "Refer the patient" to others "where medically warranted", and

1  provide the others with "all patient information" which includes "all treatment modalities in

2  use." *Id.* at 4-6. These sanctions exceeded those for record-keeping violations; the discipline

3  was for the indefensible negligence and/or incompetence related to his Lyme treatments.

### 1.2    Jann Bellamy Reports on the Discipline Imposed on Dr. Cameron

5  Jann Bellamy is a "Contributor" to Science-Based Medicine and Dr. Steven Novella is

6  the Executive Editor.[4]  *See* Complaint at ¶¶ 2 & 4. Plaintiff alleges that Novella "posted, caused

7  to be posted or conspired with the other named defendants to post" the allegedly defamatory

8  statements in the articles.  *Id.* at ¶ 4.  There are no allegations he wrote or revised any of the

9  articles.  *Id.* at ¶ 20 (asserting both articles were written by Attorney Bellamy).  Dr. Cameron

10  alleges that the other defendants "participated in the posting and reposting of the defamatory

11  article[.]"  *Id.* at ¶ 21.  The allegations all address the two articles written by Attorney Bellamy.

12  Bellamy identifies Dr. Cameron as a "'Lyme literate' guru" who was given an agreed 3-

13  year probation due to professional misconduct charges based on his stipulation of inability to

14  defend against at least one charge.  Cameron Article at 4.  She identifies his practice, degree,

15  and board certification in internal medicine, but notes (with hyperlinks to verifying sources) that

16  he did not do a fellowship or receive board certification in the Infectious Diseases sub-specialty.

17  *See id.* at 5. She quotes Dr. Cameron's claim that he is a "recognized leader" for "expertise in

18  the diagnose and treatment of Lyme disease," but opining it is a self-serving designation, since

19  his recognition is among those who treat so-called "chronic Lyme" with long-term antibiotics,

20  not among competent infectious disease specialists.  *Id.*  Bellamy cites to governmental

21  organizations rejecting such diagnosis and treatment with long-term antibiotics.  *See id.*[7]

22

---

23  [4] Although it does not appear in the version of the Cameron Article at Dkt. No. 1-1, the Court, per Rule 10(c), may
consider the original, online version where the hover-over menu, based on the same underlying HTML code,

24  identifying the Contributors and Editors.  Ms. Bellamy is a contributor only, not an editor.

25  [7] Linking to, inter alia, Auerwerter, et al, *Scientific evidence and best patience care practices should guide the
ethics of Lyme disease activism*, 37 J. MED. ETHICS 68 (Feb. 2011) at

26  https://www.ncbi.nlm.nih.gov/pubmed/21097940 and Marzec, et al., "Serious Bacterial Infections Acquired During

28

Next, Bellamy discusses the International Lyme and Associated Diseases Society, of which Dr. Cameron is past-president, providing information as to its lack of accreditation and how its "guidelines" are not taught as part of accredited medical education programs. *Id.* at 6. She discusses Dr. Cameron's efforts to protect these practitioners from investigation based on the "recommendation or provision of a treatment modality to a particular patient by such licensee that is not universally accepted by the medical profession, including but not limited to, varying modalities used in the treatment of Lyme disease and other tick-borne diseases." N.Y. Pub. Health Law § 230 (9-b); *see also* Cameron Article at 6, linking to http://danielcameronmd.com/cameron-legislative-affairs/ .

The article then discusses Dr. Cameron's publications in a "bottom-feeder journal" and a "sharp rebuke" he received stating that his clinical arguments are not among the "consensus among clinicians who practice evidence-based medicine[.]" *Id.* at 7, linking to and quoting Feder, *Letter to the Editor re: An Appraisal of "Chronic Lyme Disease"*, 358 N. ENG. J. MED. 430-31 (Jan,. 24, 2008).[8] She then quotes Dr. Cameron's website statement that his dispute with the consensus of qualified experts is merely "different points of view." Cameron Article at 7-8.

The article discusses Cameron's disciplinary history. *See id.* at 8-13. It notes that the charges were based on expert review and were "uncontested." *Id.* at 8. Dr. Cameron states that they were not uncontested based on his formal denial of every allegation in the Statement of Charges. *See* Complaint at ¶ 44 & Dkt. No. 1-4. However, the article is not discussing the proceedings in general, but rather discusses the Consent Order and Consent Agreement, which are devoid of any contest of the underlying allegations, except that the Consent Agreement would not constitute an admission *if* the Board did not adopt it. *See* Exhibit 2 at 10.

---

Treatment of Patients Given a Diagnosis of Chronic Lyme Disease—United States", CDC Morbidity and Mortality Weekly Rep. (Jun. 16, 2017) at https://www.cdc.gov/mmwr/volumes/66/wr/mm6623a3.htm

[8] Available at https://www.nejm.org/doi/full/10.1056/NEJMra072023#t=letters.  A copy is attached as Exhibit 3.

1    The article continues, noting that the charges do not explicitly address "Chronic Lyme,"

2    thereby avoiding conflict with the new statute, but address his substandard care.  *See* Cameron

3    Article at 8-10.  However, his treatment of patients who had Lyme disease a decade or so prior

4    is consistent with the "Lyme literate" and "chronic Lyme" notion.  *Id.* at 10-11.

5         The article then observes that Dr. Cameron, in being disciplined, has joined the ranks of

6    other practitioners whose Lyme-related methodologies have undergone scrutiny.  *See id.* at 11,

7    linking to Auerwaerter, *supra* (rebutting Drs. L. Johnson and R.B. Stricker); Whelan, D. "Lyme,

8    Inc." FORBES (Feb. 23, 2007);[9] "The Chronic Debate over Lyme Disease,"14 Nature Medicine

9    1135 (Nov. 2008);[10] and Bellamy, J. "Florida Revokes medical license of 'Lyme literate'

10   doctor," SCIENCE-BASED MEDICINE (Dec. 22, 2016) (discussing John Letz, MD).[11]  Bellamy

11   then delved into the discipline, including the need for a "practice monitor," ensure informed

12   consent, maintain insurance, obtain medical records, and refer patients out, as well as take

13   continuing medical education (CME) courses.  *Id.* at 11-13.  She notes the risks of the discipline

14   in not going far enough to restrict Dr. Cameron's unscientific treatments.  *See id.* at 12.  She

15   concludes with a murky outlook on the future: whether the discipline of Dr. Cameron will rein

16   in practitioners or whether they will be emboldened by favorable pending legislation.  *See id.* at

17   13 citing: a) Tick borne illness treatment and education act of 2017, NY A.B. 114 (2017); b)

18   Tick borne illness treatment and education act of 2017, NY S.B. 4713 (2017); c) NY S.B. 670

19   (2017); d) NY A.B. 4863 (2017); e) NY S.B. 2168 (2017); and f) NY A.B. 6927 (2017).

20        On November 9, 2017, Attorney Bellamy published the article "Another 'Chronic

21   Lyme' VIP disciplined by NY medical authorities: Bernard Raxlen." appearing at Dkt. No. 1-2

22   ("Raxlen Article").[12]  That article links to and discusses the three-year probation imposed on Dr.

23

24   [9] At link https://www.forbes.com/forbes/2007/0312/096.html#c9c7275476c6
     [10] At link https://www.nature.com/articles/nm1108-1135
25   [11] At link https://sciencebasedmedicine.org/florida-revokes-medical-license-of-lyme-literate-doctor/
     [12] Available at https://sciencebasedmedicine.org/another-chronic-lyme-vip-disciplined-by-ny-medical-authorities-
26   bernard-raxlen/,

27
     Memorandum in Support of Motion to Dismiss
28

Bernard Raxlen, BPMC No. 17-303.  *See* Raxlen Article at 4.[13]  It is similar to the one for Dr. Cameron, with both represented by the same counsel facing similar allegations.  Compare Complaint, Exhibit A with Exhibit 4.  Like Dr. Cameron, Dr. Raxlen treats "chronic Lyme." *See* Raxlen Article at 4, linking to http://lymeresourcemedical.com/a-brief-history-on-dr-raxlen/.

Dr. Cameron asserts that the Raxlen Article constitutes a re-posting of the Cameron Article.  Complaint at ¶ 18.  Specifically, one sentence in the Raxlen Article states:

> Based on similar charges of professional misconduct, David Cameron, MD, was also put on probation with numerous practice restrictions in June.

Raxlen Article at 4.  At Dr. Cameron's name is a hyperlink to the Cameron Article.  *See id.*; *see also* Complaint at ¶¶ 19 & 52.  Dr. Cameron does not allege that any statement in that sentence or the Raxlen Article is itself false or defamatory; he claims the mere hyperlinking to the Cameron Article constitutes a republication thereof.  *See*, Complaint, *passim*.

## 2.0  Legal Standard

### 2.1  Anti-SLAPP Standard

Conn. Gen. Stat. § 52-196a ("Connecticut anti-SLAPP statute")[14] protects Connecticut citizens' right to free speech.  Under it, "[i]n any civil action in which a party files a complaint, … against an opposing party that is based on the opposing party's exercise of its right of free speech … under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, such opposing party may file a special motion to dismiss the complaint…."  Conn. Gen. Stat. § 52-196a(b).  The applicable standard is:

> The court shall grant a special motion to dismiss if the moving party makes an initial showing, by a preponderance of the evidence, that the opposing party's complaint … is based on the moving party's exercise of its right of free speech … under the Constitution of the United States or the Constitution of the

---

[13] A copy is filed herewith as Exhibit 4.

[14] "SLAPP is an acronym for a 'strategic lawsuit against public participation,' which is a suit that is brought primarily to chill the valid exercise of a defendant's right to free speech[.]"  *Ernst v. Carrigan*, 814 F.3d 116, 117 (2d Cir. 2016)

state in connection with a matter of public concern, unless the party that brought the complaint … sets forth with particularity the circumstances giving rise to the complaint … and demonstrates to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits of the complaint ….

Conn. Gen. Stat. § 52-196a(e)(3). The Complaint is based on the exercise of free speech in connection with a matter of public concern and Plaintiff lacks probable cause of prevailing.

Alternately, the matter should be dismissed under the Florida anti-SLAPP law, Fla. Stat. § 768.295. That statute prohibits a lawsuit (a) that is "without merit," and (b) because the defendant "has exercised the constitutional right of free speech in connection with a public issue," which the statute defines as any written or oral statement "made in or in connection with a . . . news report, or other similar work." *Boling v. WFTV, LLC*, 2018 Fla. Cir. LEXIS 1860 (Fla. 9th Jud. Cir. Feb. 28, 2018), slip op. at 3, quoting Fla. Stat. §§ 768.295(2)(a), (3). This lawsuit arises out of such rights and, the lawsuit is without merit. Under either, an award of attorneys' fees and costs are mandatory. *Boling, supra,* citing Fla. Stat. § 768.295(4).

### 2.2     Application of Anti-SLAPP in Federal Court

Most state anti-SLAPP statutes are substantive and, thus, applicable *See, e.g.*, *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-73 (9th Cir. 1999) (California statute); *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 168-169 (5th Cir. 2009) (Louisiana statute); *Godin v. Schencks*, 629 F.3d 79, 86-87 (1st Cir. 2010) (Maine statute). The Second Circuit agrees. *See Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (Nevada statute); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) (California statute). The substantive rights to immunity from suit and fee-shifting will apply, whereas procedural aspects such as filing deadlines and discovery stays do not. *See Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016).

The substantive rights in the Connecticut statute are identical to those in the Nevada and

California statutes. The same holds true for the Florida analog.[16]  The operative provisions focus on the substantive right to immunity from a lawsuit arising from free speech on a matter of public concern. *See* Conn. Gen. Stat. § 52196a(b); Fla. Stat. §§ 768.295 (3), (4). The laws address the substantive burden. *See* Conn. Gen. Stat. § 52196a(e)(3); Fla. Stat. § 768.295(3). And, the laws provide a substantive right to attorneys' fees. *See* Conn. Gen. Stat. § 52196a(f); Fla. Stat. § 768.295(4). Thus, they are applicable here.

### 2.3   Connecticut's anti-SLAPP Statute Should be Applied

The Court should apply Connecticut's anti-SLAPP law. "Ordinarily, in a diversity case, the Court must apply the choice of law rules of the forum state to determine which state's substantive law should be applied." *Neal v. Asta Funding, Inc*., No. 13 CV 2176 (VB), 2014 U.S. Dist. LEXIS 113142, at *4 (S.D.N.Y. June 17, 2014)(Briccetti, J.).  In tort actions,[18] New York applies the substantive law of the jurisdiction with the most significant interest in the "specific issue raised in the litigation." *Schultz v. Boy Scouts of Am., Inc*., 65 N.Y.2d 189, 196, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985). Where alleged defamation is published nationally, the "presumptive" rule that the law of plaintiff's domicile applies "does not hold true . . . if 'with respect to the particular issue, some other state has a more significant relationship to the issue or the parties.'" *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) (quoting

---

[16] Recently, the Eleventh Circuit Court of Appeals found that Georgia's anti-SLAPP statute could not apply in Federal court under the *Erie* doctrine.  *See Carbone v. CNN, Inc*., No. 17-10812, 2018 U.S. App. LEXIS 35095 (11th Cir. Dec. 13, 2018).  However, it is unlikely the Eleventh Circuit would find Florida's statute inapplicable. In *Carbone,* the Court focused on the procedural requirements of the Georgia law; Florida's contains none of those. Instead, the Florida statute provides only that it may be invoked as a substantive fee shifting right as part of an ordinary motion to dismiss or motion for summary judgment. Fla. Stat. § 768.295(4). Although the Connecticut statute is more similar to Georgia's, they are both similar to Nevada's, permitted in the *Adelson* matter, and the Second Circuit would likely follow its own precedent.

[18] Of course, the anti-SLAPP laws are not limited to tort claims.  They are, essentially, substantive immunities. Immunities from suit are governed under the rules of *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972).  *See Barkanic v. Gen. Admin. of Civil Aviation of People's Republic of China*, 923 F.2d 957, 963 (2d Cir. 1991).  Under *Neumeier*, the law where the wrong occurred controls unless the parties are domiciliaries of the same state.  *See id*. at 962.  Here, Dr. Novella's wrong could only have occurred in Connecticut.  Alternately, since the publication was made in Florida, its law would apply.  New York's would not.

Restatement (Second) of Conflict of Laws § 150 cmt. (e) (1977)).  "Justice in conflicts rules, as in jurisdiction, requires minimal contacts with another forum before subjecting the nondomiciliary to its laws.  There is a serious question of deprivation of the defendant's due process rights [in] casting him in liability under the law of a state with which he [has] in no way voluntarily associated himself." *Id.* at 1093 (internal citation and quotation marks omitted).

Here, there are no allegations of Dr. Novella's contacts with New York;[19] the only allegation is that he is an editor of a website where the article was published.  He did not submit himself to New York law and there are no allegations that he had any role in the publication of the article.[20] Instead, the only specific allegation as to Dr. Novella is to his status as Executive Editor in Connecticut.  Connecticut, therefore, has the most significant interest in protecting its citizen.  *See, e.g., Doctor's Data, Inc. v. Barrett*, No. 10 C 03795, 2011 U.S. Dist. LEXIS 134921, at *8 (N.D. Ill. Nov. 22, 2011) (holding that anti-SLAPP law of state of defamation

---

[19] The Court may also dismiss the matter for lack of personal jurisdiction over Dr. Novella under Fed. R. Civ. P. 12(b)(2).  *See Fischer v. Stiglitz*, No. 15-CV-6266 (AJN), 2016 U.S. Dist. LEXIS 74842, at *14-16 (S.D.N.Y. June 8, 2016)(observing that CPLR § 302(a)(1) required New York contacts that were "something more" than the mere publication of an article on the internet.)  There are no allegations of sufficient contacts and mere foreseeability of injury in New York is insufficient.  *See Charles Schwab Corp. v. Bank of Am. Corp*., 883 F.3d 68, 87 (2d Cir. 2018).  However, Dr. Novella would prefer the Court adjudicate the matter on the merits, especially as to the anti-SLAPP aspect, to avoid a second round of litigation.

[20] The speculative and collective identification of the defendants fails to adequately identify which defendant caused Plaintiff's alleged injury.  Specifically, it fails to set forth with particularity what Dr. Novella did to give rise to alleged liability, rather than any other person affiliated with *Science-Based Medicine*.  The Complaint, therefore, is insufficient and speculative under *Twombly* and *Iqbal, supra*.  *See Kester v. Zimmer Holdings, Inc.*, No. 2:10-cv-00523, 2010 U.S. Dist. LEXIS 59869, at *17 (W.D. Pa. June 16, 2010).A plaintiff's generic averments and formulaic recitations that do not disambiguate defendants fail under the federal pleading standard.  *See Sherman v. Stryker Corp.*, No SAVC 09-224 JVS (ANx), 2009 U.S. Dist. LEXIS 34105 (C.D. Cal. March 30, 2009).

Courts in this Circuit and elsewhere have repeatedly dismissed actions where the complaints lump defendants together.  *See Haskins v. Zimmer Holdings, Inc.*, No. 1:09-CV-236, 2010 U.S. Dist. LEXIS 7690, 2010 WL 342.552 (D. Vt. Jan. 29, 2010); *Hendrikx v. State*, No. 2:13-cv-0087-RJS, 2013 U.S. Dist. LEXIS 155217, at *6 (D. Utah Oct. 29, 2013) (Rule 8(a) not met where "[t]he Complaint wholly fails to give the Defendants adequate notice of the misconduct each is alleged to have committed."); *Combs v. Stryker Corp.*, No. 2:09-cv-02018-JAM-GGH, 2009 U.S. Dist. LEXIS 115920, 2009 WL 4929110 (E.D. Cal. Dec. 14, 2009); *Timmons v. Linvatec Corp.*, 263 F.R.D. 582, 2010 U.S. Dist. LEXIS 14057 (C.D. Cal. 2010); *Adams v. I-Flow Corp.*, Case No. CV09-09550 R (SSx), 2010 U.S. Dist. LEXIS 33066 (CD. Cal. Mar. 30, 2010); *Peterson v. Breg, Inc.*, 2:09-cv-2044 JWS, 2010 U.S. Dist. LEXIS 48985 (D. Ariz. April 28, 2010).  As the Complaint is subject to dismissal on this basis, it is similarly insufficient for choice of law purposes.

1    defendant has most significant interest applies).   Alternately, as Plaintiff does not allege New

2    York law applies, but rather alleges that the authoring and publishing occurred in Florida,

3    Florida's anti-SLAPP law should apply.  *See* Complaint at 54-56.  In either event, the complaint

4    should be dismissed and the fee-shifting provisions of the applicable law should apply.

5                      **2.4     Dismissal Under Rule 12(b)(6)**

6            An action may be dismissed under both state anti-SLAPP law and Fed. R. Civ. P.

7    12(b)(6).  *See Adelson*, 774 F.3d at 805.   A complaint must contain "enough facts to state a

8    claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

9    (2007); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A claim is

10   plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

11   inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 662, 678

12   (2009).  "[N]aked assertions" or "conclusory statements" fail. *Id*. (quotation omitted).

13           Dr. Cameron says he is a "nationally recognized leader for his expertise in the diagnosis

14   and treatment of Lyme disease and other tick-borne illnesses."  *See* Cameron Article quoting

15   http://danielcameronmd.com/dr-daniel-cameron-lyme-expert/.    "[I]t is no answer to the

16   assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is

17   sufficient, . . . that '[the plaintiff] voluntarily engaged in a course that was bound to invite

18   attention and comment.'"  *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1496 (11th Cir. 1988),

19   quoting *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861 (5th Cir. 1978).  Public

20   figures must "show that the statements were made with 'actual malice'—that is, with

21   knowledge that the statements were false or with reckless disregard as to their falsity."  *Curtis*

22   *Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967); *Lerman v. Flynt Distrib. Co*., 745 F.2d 123,

23   137, 139 (2d Cir. 1984) (limited-purpose figures).  "[Actual] malice must be alleged plausibly

24   in accordance with Rule 8." *Biro v. Condé Nast*, 807 F.3d 541, 545 (2d Cir. 2015).[21]

---

[21] Under the New York anti-SLAPP law, this is the burden Dr. Cameron must meet. *See* NY CVR § 76-A(2).

1  Failure to plausibly plead facts satisfying the actual malice standard warrants

2  dismissal.[22] *See, e.g., Biro*, 807 F.3d at 546; *Haywood v. St. Michael's College*, 536

3  F. App'x 123, 124 (2d Cir. 2013) ("the complaint simply does not plausibly allege that

4  [defendants] acted with actual malice"); *Sentementes v. General Elec. Co.*, 2014 WL 2881441,

5  *11 (D. Conn. June 25, 2014) (dismissing claim for failure to allege facts tending to show

6  knowledge of falsity or reckless disregard for the truth, "despite using the word 'maliciously' in

7  their pleadings"). This Court emphasizes the special role the courts must play at the pleading

8  stage when First Amendment freedoms are at stake: "[I]n defamation cases, Rule 12(b)(6) not

9  only protects against the costs of meritless litigation but provides assurance to those exercising

10  their First Amendment rights that doing so will not needlessly become prohibitively

11  expensive." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013) *aff'd* 807 F.3d 541.

12  **3.0    ANALYSIS**

13      **3.1    The Articles Are Protected Under the Anti-SLAPP Law**

14      No matter which state's anti-SLAPP law governs, Dr. Novella is protected under it. The

15  articles are speech on a matter of public concern and in connection with public issues. The

16  "right of free speech" under the Connecticut statute "means communicating, or conduct

17  furthering communication, in a public forum on a matter of public concern." *See* Conn. Gen.

18  Stat. § 52-196a(a)(2). Similarly, under Florida law, "the right[] of free speech in connection

19  with public issues" includes written statements "made in or in connection with a…news report,

20  or other similar work." Fla. Stat. § 768.295 (1), (2)(a). The statements were made on a public

21  forum, a public website.

22      The speech is on a matter of public concern. The Connecticut anti-SLAPP statute

23  defines "matter of public concern" as "an issue related to (A) health or

24

25  ───────────────

   [22] Even if it is determined that Dr. Cameron is not a public figure, it must still demonstrate that the statements were

26  negligently made, which as discussed in greater detail below, they were not.

27

28

safety, (B) environmental, economic or community well-being, … [or] (D) a public official or public figure ….." Conn. Gen. Stat. § 52-196a(1).   The articles address disciplinary actions taken by a governmental agency, public health, and proposed legislation.

The third element, lack of probable cause of prevailing, is discussed below.  For civil litigation, Connecticut defines probable cause as "a *bona fide* belief in the existence of the facts essential under the law . . . such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *J.K. Scanlan Co. v. Constr. Grp., Inc*., 80 Conn. App. 345, 350 (2003) (quotations omitted).  There is no probable cause to support Plaintiff's claims.

### 3.2    Dr. Novella is Immune under CDA Section 230

Plaintiff asserts two claims in his Complaint: libel *per se* and injunctive relief.[24]  Both claims seek to hold Dr. Novella liable for statements that were not authored by him, but merely were published on a website where he holds the title "Executive Editor." This is the factual scenario contemplated by the Communications Decency Act, 47 U.S.C. § 230 (the "CDA" or "Section 230"). The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  The effect of the statute is to bar "'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content.'" *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450 (E.D.N.Y. 2011) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)).  "Courts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 700-701

---

[24] The second claim "is subject to dismissal on the ground that an injunction is a remedy, not a separate cause of action." *Catalano v. BMW of N. Am., Ltd. Liab. Co.*, 167 F. Supp. 3d 540, 563 (S.D.N.Y. 2016).

1   (S.D.N.Y. 2009) (collecting cases).

2   "Section 230 immunity, like other forms of immunity, is generally accorded effect at the

3   first logical point in the litigation process." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com,*

4   *Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009).  For this reason, dismissal of a complaint on Section

5   230 grounds "is appropriate unless the complaint pleads non-conclusory facts that plausibly

6   indicate that 'any alleged drafting or revision by [the defendant] was something more than a

7   website operator performs as part of its traditional editorial function,' thereby rendering it an

8   information content provider." *Westlake Legal Group v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th

9   Cir. 2015).  Section 230 only fails to apply where an information service provider acts as an

10  "information content provider" with respect to the statements in question, such that it is

11  "'responsible, in whole or in part, for the creation or development of [the]

12  information.'" *Ascentive*, *supra* at 474.  "Asserting or implying the mere possibility" that a

13  defendant played a more involved role in the creation of statements beyond that of a publisher is

14  insufficient to defeat Section 230 immunity.  *Id*. at 474-75.

15  A provider of an interactive computer service for purposes of the statute is one who

16  operates "'any information service, system, or access software provider that provides or enables

17  computer access by multiple users to a computer service.'" *Gucci Am., Inc. v. Hall & Assocs.*,

18  135 F. Supp. 2d 409, 412 (S.D.N.Y. 2001).  A website falls within this definition.  *Ascentive*,

19  *supra* at 473 (collecting cases).  Plaintiff pleads no plausible allegations that Dr. Novella acted

20  in any capacity other than as the provider of an interactive computer service – admitting that

21  Bellamy was the author.

22  Plaintiff claims Dr. Novella "conspired with the other named defendants" without any

23  specific factual allegations.[25]   Complaint at ¶ 4.   "[A]lthough tort liability may be imposed

---

25  [25] New York does not recognize an independent tort of conspiracy. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).

28

based on allegations of conspiracy which connect nonactors, who might otherwise escape liability, with the tortious acts of their coconspirators, more than a conclusory allegation of conspiracy or common purpose is required to state a cause of action against such nonactor." *Treppel v. Biovail Corp.*, 2005 U.S. Dist. LEXIS 18511, at *18 (S.D.N.Y. Aug. 30, 2005) quoting *Schwartz v. Soc'y of the New York Hosp.*, 199 A.D.2d 129, 129-30, 605 N.Y.S.2d 72 (App. Div. 1993) (citations omitted) (dismissing conspiracy to defame claims because of a lack of "independent culpable behavior" on the alleged conspirators' part to link them to the allegedly defamatory statements).   These are merely the sort of "[c]onclusory allegations or legal conclusions masquerading as factual conclusions [that] will not suffice to [defeat] a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).   There are no plausible allegations of an agreement to defame Dr. Cameron.   Thus, absent a cognizable conspiracy claim, Dr. Novella is immune.

Bellamy's status as a "Contributor" is not legally relevant.   Section 230 immunizes operators of a website from claims based on statements of other titled persons.   *See Best Western Int'l, Inc. v. Furber*, 2008 U.S. Dist. LEXIS 70552 (D. Ariz. Sept. 5, 2008) (finding that co-operators of web site were immune under Section 230 as to statements authored by other co-operator); *see also  Higher Balance, LLC v. Quantum Future Group, Inc.*, 2008 U.S. Dist. LEXIS 102611, *20 (D. Ore. Dec. 18, 2008); *Stevo Design, Inc. v. SBR Mktg.*, 919 F. Supp. 2d 1112 (D. Nev. 2013); *Shamili v. Real Estate Group of N.Y., Inc.*, 17 N.Y.3d 281, 292-93 (2011); *Internet Brands, Inc. v. Jape*, 760 S.E.2d 1, 4 (Ga. App. 2014) ; *Derek W. Cornelius & Si03, Inc. v. Bodybuilding.com, LLC*, 2011 U.S. Dist. LEXIS 59005, *17 (D. Idaho, June 1, 2011).   Dr. Novella is immune under Section 230.

### 3.3     The Complaint is Time-Barred

Although the Court should apply Connecticut's (or Florida's) anti-SLAPP law, the New York statute of limitations applies and is dispositive.   Plaintiff's attempts to plead around the statute of limitations defenses and "single publication rule," are to no avail.

CPLR § 215(3) provides that "an action to recover damages for . . . libel, slander, [or] false words causing special damages . . . shall be commenced within one year." The Complaint and its exhibits, on their face, reveal that the alleged defamatory statements were not published within one year of Plaintiff initiating this action. Plaintiff seeks to invoke the two-year statute of limitations of Fla. Stat. § 95.11(4)(g). Complaint at ¶¶ 54-56. New York's statute of limitations, rather than Florida's applies.

This Court may apply both the New York statute of limitations and Connecticut's anti-SLAPP law pursuant to the doctrine of *dépecage*. "Under the doctrine of *dépecage* as applied by New York courts, the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n.1 (2d Cir. 2001)(internal quotation omitted). Here, the anti-SLAPP law of Connecticut should be found to apply as to the law of substantive immunity from suit, while New York's law of defamation, including its statute of limitations, also applies. *See Barrett, supra* at *8 ("Under the doctrine of *dépecage*, the issue of whether a statement is defamatory is distinct from the issue of whether that statement is privileged.")(collecting cases).

"When *dépecage* is relied upon, New York courts utilize the paramount interest test to decide which law to apply to each of the issues." *Simon v. Philip Morris*, 2000 U.S. Dist. LEXIS 16713, at *90 (E.D.N.Y. Nov. 16, 2000)(applying *dépecage* to statute of limitations choice) citing *Hutner v. Greene*, 734 F.2d 896 (2d Cir. 1984). New York has a paramount interest in applying its statute of limitations, expressly providing that, for New York residents such as Dr. Cameron, the law of New York applies irrespective of where the action accrues.[26] *See* CPLR 202; *see also Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 424 F.2d 427, 428 (2d

---

[26] In contrast, Connecticut has a paramount interest in protecting its citizens from meritless suits based on First Amendment-protected speech on a matter of public concern.

Cir. 1970)("for causes accruing in another state, non-resident plaintiffs will be barred from instituting suit if they are barred by the statute of limitations of either jurisdiction; New York residents, however, will be affected only by the New York limitations period.")  However, if the borrowing statute does not apply and the Court finds Florida has the most significant interest and its statute of limitations applies, and if the Court opts not to engage in *dépeçage*, so too should Florida's anti-SLAPP statute apply.[27]

New York strictly adheres to the "single publication rule," even on online communications. *See Firth v. State*, 98 N.Y.2d 365, 370 (2002).  The statute is only "retriggered" by a "republication" of the statement on a separate occasion from the original that is meant to reach a new audience. *See id*. at 371 (quoting *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 435 (1981)).  It is also "irrelevant, for statute of limitations purposes, that a story remains online after its publication."  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 267 (S.D.N.Y. Aug. 1, 2013).

The Raxlen Article is not a republication.  As this Court recently observed:

> Although one who republishes defamatory content may be liable, *see* Restatement (Second) of Torts § 578 (1977), "[a] hyperlink . . . does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication," *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016); *see In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) ("[T]hough a link and reference may bring readers' attention to the existence of an article, they do not republish the article.").

*Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018); *see also Haefner v. New York Media, LLC*, 27 Misc. 3d 1208(A) (Sup. Ct. 2009); *Martin v. Daily News, L.P.*, 990 N.Y.S. 2d 473, 483 (1st Dep't 2014); *Graboff v.*

---

[27] Similarly, if Florida law applies, the Complaint fails for failure to give notice under Fla. Stat. § 770.01.  The purpose is to permit a publisher to make a correction, apology, or retraction.  *See* Fla. Stat. § 770.02.  The law requires written notice to a defendant at least five days prior to initiating suit for libel based on a publication in the online "medium".  *See Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1307-08 (S.D. Fla. 2008).  This a defect cannot be cured by mere amendment, but rather the action must be dismissed.  *See Gifford v. Bruckner*, 565 So. 2d 887, 888 n.1 (Fla.2d DCA 1990).  If Connecticut law applies, Plaintiff is entitled only to actual damages, of which none are specifically pleaded, for failure to requests a retraction. *See* Conn. Gen. Stat. § 52-237.

*Am. Ass'n of Orhopaedic Surgeons*, 559 Fed. Appx. 191, 195 (3d Cir. 2014).   The only allegations about the Raxlen Article are how clicking on the link under Plaintiff's mistyped name yields the Cameron Article.   *See* Complaint at ¶ 19; *see* also Complaint at ¶ 52 (calling it "a separate aggregate publication" without specific defamatory content asserted).   Thus, the Complaint is time-barred.

### 3.4   The Statements are Neither False nor Defamatory

Assuming *arguendo* that Section 230 does not immunize Dr. Novella, and Plaintiff timely brought his claims, Plaintiff has not stated a claim for relief.   The elements of a defamation claim are: "(1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) causing special harm or constituting [defamation] *per se*; and (7) not protected by privilege." *Neal, supra* at *5 (citing *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001)).[29]   Dr. Cameron cannot meet elements 1, 2, 5, and 7.[30]   A statement can only be defamatory if it is a statement of fact that is provably true or false, and when a statement is "substantially true," such that "'the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done.'" *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503-04 (S.D.N.Y. 2012) (quoting *Cafferty v. S. Tier Publ'g Co.*, 226 N.Y. 87, 93 (1919)).

A defamation plaintiff must "specify the words about which they complain. 'The failure

---

[29] The law of defamation is essentially the same in Connecticut.  *See Simms v. Seaman*, 308 Conn. 523, 547-48, 69 A.3d 880 (Conn. 2013)(quoting *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28, 969 A.2d 736 (Conn. 2009); *Woodcock v. Journal Publishing Co., Inc.*, 230 Conn. 525, 554, 646 A.2d 92 (Conn. 1994); and *Skakel v. Grace*, 2014 U.S. Dist. LEXIS 30124, 2014 WL 902675 at *4-5 (D.Conn. March 7, 2014).  The same is true in Florida.  *See Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214 n.8 (Fla. 2010), citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *Fortson v. Colangelo*, 434 F. Supp.2d 1369, 1378-79 (S.D. Fla. 2006)

[30] Dr. Cameron likely cannot meet the element of harm, either.  He has pointed to no special damages.  And he nakedly assets they injure him in his profession.  Complaint at ¶ 58.  But, it is best to determine whether a statement is capable of conveying a defamatory meaning and then to determine whether it is libel per se or per quod. *See Horne v. Matthews*, 1997 U.S. Dist. LEXIS 14518, *6-7 n.4 (S.D.N.Y. Sept. 25, 1997).

1  to make any reference to any allegedly defamatory statements fails to comport with even the

2  liberal pleading requirements of Federal Rule of Civil Procedure 8.'"  *Ivchencko v. Glob. MRV,*

3  *Inc*, 2013 U.S. Dist. LEXIS 36127, at *33 (E.D.N.Y. Feb. 4, 2013) quoting *The Homeless*

4  *Patrol v. Joseph Volpe Family*, 2010 U.S. Dist. LEXIS 73914 at *16 (S.D.N.Y. 2010).  "Mere

5  conclusory statements that the claimant was disparaged by false statements are insufficient to

6  state a defamation claim." *Camp Summit of Summitville, Inc. v. Visinski*, 2007 U.S. Dist. LEXIS

7  28496, at *10 (S.D.N.Y. Apr. 16, 2007). Although Dr. Cameron liberally quotes the Cameron

8  Article, he mentions few phrases with particularity he claims are false.  Similarly, he fails to

9  identify any specific statements attributable to Dr. Novella. Where a "claim for defamation

10  against all defendants, lumped together" was "pleaded in so vague and conclusory a fashion as

11  to fail to satisfy even the lenient notice pleading requirements of Rule 8(a)", such should be

12  dismissed.  *Neal, supra* at * 7, quoting *Rafferty v. Halprin*, 1991 U.S. Dist. LEXIS 10344, at *8

13  (S.D.N.Y. July 26, 1991).  As in *Neal,* Dr. Novella's "role in any alleged defamation 'is on its

14  face mere speculation.'" *Id.* at *7, quoting *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F.

15  Supp. 661, 668 (S.D.N.Y. 1991).

16      Statements of opinion or rhetorical hyperbole are not statements of fact, and thus cannot

17  be defamatory.  There "is no such thing as a false idea." *Gertz v. Robert Welch*, 418 U.S. 323,

18  339-40 (1974); *see also Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 286 (1974)

19  (finding "rhetorical hyperbole" and "lusty and imaginative expression" not

20  actionable).  Whether a statement is factual is a question of law that the court should dispose of

21  at the pleading stage.  *See Gertz*, 418 U.S. at 339-40; *Condit v. Dunne*, 317 F. Supp. 2d 344, 358

22  (S.D.N.Y 2004); *Treppel v. Biovail Corp.*, 2004 U.S. Dist. LEXIS 20714, *36-37 (S.D.N.Y.

23  Oct. 15, 2004); *Adelson v. Harris*, 973 F. Supp. 2d 467, 482 (S.D.N.Y. Sept. 30, 2013).  Further,

24  a court must consider the overall context, tone, and apparent purpose of a statement and whether

25  a reasonable reader, not any conceivable reader, would interpret a given statement literally or

26  otherwise view it as a mere expression of opinion, hyperbole or otherwise. *See Mr. Chow of*

27

28

1   *New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 229 (2d Cir. 1985); *see also Chau v. Lewis*, 771

2   F.3d 118, 128 (2d Cir. 2014); *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995); *Torain v. Liu*, 279

3   Fed. Appx. 46, 46 (2d Cir. 2008); *Fleiss v. Wiswell*, 157 Fed. Appx. 417, 417 (2d Cir. 2005)

4   (summary order).  Further, '"when an author outlines the facts available to him, thus making it

5   clear that the challenged statements represent his own interpretation of those facts, leaving the

6   reader free to draw his own conclusions, those statements are generally protected by the First

7   Amendment."'  *Dunne*, 317 F. Supp. 2d at 364 (quoting *Partington v. Bugliosi*, 56 F.3d 1147,

8   1157 (9th Cir. 1995)).

9       The New York Constitution provides even greater protection for statements of opinion,

10   finding that statements of "pure" opinion are absolutely protected.  *See Flamm v. Am. Assoc. of*

11   *Univ. Women*, 201 F.3d 144, 147-48 (2d Cir. 2000).  New York uses "a flexible approach in

12   distinguishing actionable fact from non-actionable opinion,"

13       In paragraph 25 of the Complaint, Dr. Cameron cites to a publication dated nine months

14   after the Cameron Article (though erroneously described as "prior") in which Ms. Bellamy

15   described what some "Lyme literate" doctors are doing; no mention is made of Dr. Cameron

16   and he does not specify which part is false. Complaint at ¶ 25.  Exhibit C to the Complaint (Dkt.

17   No. 1-3) shows both a snippet of the Raxen Article and a March 15, 2018 article.[31]  Paragraph

18   26 refers to the Cameron Article as defamatory, but again without any specific falsity alleged.[32]

19   Paragraph 29 observes that Dr. Cameron is called a "Lyme literate guru" and presumes, based

20   on the "tags" at the end of the article that the June 22, 2017 somehow *republished* the March 15,

21   2018, article that *had not yet been written*.

22       Dr. Cameron claims that the later-published snippet implies that he is to be deemed

23   among the ones "who are scamming patients out of thousands of dollars with needless long-

24

25   [31]  A copy of that article, appearing at https://sciencebasedmedicine.org/more-political-science-proposed-laws-protect-lyme-literate-doctors-from-discipline/ , is reproduced at Exhibit 5

26   [32]  In paragraph 26, Plaintiff misstates the date of the Cameron Article, correctly identified in paragraph 25.

27

28

term antibiotics based on a fake diagnosis of 'chronic Lyme'." Complaint at ¶ 30. Setting aside

the temporal paradox, this is a statement of opinion, not fact. The term "scam":

> means different things to different people . . . and there is not a single usage in
> common phraseology. While some connotations of the word may encompass
> criminal behavior, others do not. The lack of precisions makes the assertion "X is
> a scam" incapable of being proven true or false.

*McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987); *see also Potomac Valve & Fittin, Inc. v.*

*Crawford Fitting co.*, 829 F.2d 1280, 1287 (4th Cir. 1987) (citing *McCabe* with

approval); *Harris*, 973 F. Supp. 2d 467, 491 (S.D.N.Y. 2013) (same); *BidZirk, LLC v. Smith*,

2007 WL 3119445 (D.S.C. Oct. 22, 2007) (same); *Washington v. Smith*, 893 F. Supp. 60, 63

(D.D.C. 1995) (same). *Accord Tobinick v. Novella*, 108 F. Supp. 3d 1299 (S.D. Fla. 2015)

(finding that Dr. Novella calling another doctor's medical clinic "dubious" was not actionable)

*aff'd* 848 F.3d 935 (11th Cir. 2017). Attorney Bellamy disclosed why she thinks the diagnosis is

fake and the treatments a needless scam, based on the Feder article.

In paragraph 31, Plaintiff claims that "he never stipulated to any of the charges listed,"

except that he admitted he "cannot successfully defend against at least one of the acts of

misconduct alleged." *See* Exhibit 2 at 3. Thus, on its face, the statement is true and the

allegation is counterfactual to his own prior concessions to the Board and this Court.

In paragraph 33,[33] Dr. Cameron quotes two paragraphs from the article where Attorney

Bellamy gives her opinion "[r]eading between the lines," "if you think about it," discussion

what "would appear to" be and what is "hard to imagine." This is pure opinion based on the

disclosed underlying Consent Order, Consent Agreement, and Statement of Charges. *See*

Exhibit 2. Though Plaintiff calls the article as containing only "selective unproven allegations"

(Complaint at ¶ 34), he admitted at least one to be provable and conceded to this Court "that the

ILADS guidelines do not allow or advise the conduct alleged in the Statement of Charges." *See*

---

[33] There is no paragraph 32.

Memorandum in Support of Motion to Dismiss

Exhibit 2 at 3 and *Zucker, supra,* at *20.  Thus, they are not "unproven allegations," but are "findings of misconduct."  Contrast Complaint at ¶ 36.

In paragraphs 40 & 41, Dr. Cameron quotes large swaths of the Cameron Article, without specifying which parts are false.  Later, in paragraph 44, Plaintiff takes issue with the term "uncontested".  As discussed above, although Dr. Cameron filed a general denial, the allegations were uncontested in the Consent Agreement and Consent Order, nor is there any allegation Attorney Bellamy possessed a copy of his general denial.  Notably, Dr. Cameron does not otherwise allege she misstated the nature of the charges or the settlement process.  At worst, this is mild editorialization that has no effect on the "gist" or "sting" of the statement, and thus does not make it defamatory, particularly in light of the overall context of the statements at issue.  *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991) (holding that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge is justified); *see Rubenstein v. Transit Workers' Union of Greater New York*, 2005 U.S. Dist. LEXIS 19969 (S.D.N.Y. Sept. 6, 2005) (finding that statements that union president was a bigot and anti-Semite were protected as opinion based on disclosed facts); *Silvercorp Metals Inc. v. Anthion Mgm't LLC*, 2012 WL 3569952 (Sup. Ct. N.Y. Cty. Aug. 16, 2012) (finding that letters with supporting hyperlinks claiming plaintiff misstated its financial figures and valuations were protected as opinion based on disclosed facts); *Themed Restaurants, Inc. v. Zagat Survey, LLC*, 801 N.Y.S.2d 38, 39-40 (1st Dep't 2005) (finding that restaurant review based on anonymous consumer reviews was protected as opinion); *Sandler v. Simoes*, 609 F. Supp. 2d 293 (E.D.N.Y. 2009) (finding that complaints about plaintiff's products with consumer protection agencies warning of unethical business practices were clearly dissatisfied customer opinions).

Even if these were not statements of opinion, Plaintiff has not plausibly alleged facts that allow for an inference of actual malice, which it must do as a public figure defamation plaintiff.  Aside from conclusory allegations as to Defendant's knowledge of the falsity of these

- 22 -

1    statements, Plaintiff alleges no plausible facts tending to show that Defendant "knew, recklessly

2    disregarded, or should have known" that Dr. Cameron filed a denial.  A mere "failure to

3    investigate the veracity of the allegation [cannot] establish actual malice," unless such a failure

4    "amounts to a 'purposeful avoidance,' that is, conduct that 'evinces an intent to avoid the

5    truth.'"  *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 105 (E.D.N.Y.

6    1997) (quoting *Sweeney v. Prisoners' Legal Servs. of New York, Inc.*, 84 N.Y.2d 786, 793

7    (1995)).  The statement is not materially false and, to the extent there was error, it was not made

8    with actual malice.    At most, Plaintiff has alleged a failure to investigate claims

9    with sufficient diligence, which is insufficient to plead actual malice, and thus Plaintiff's

10   defamation claims must be dismissed.  *Biro*, 807 F.3d at 546-47.

11          Similarly, Paragraph 42 quotes a large paragraph, which Dr. Cameron characterizes as a

12   "comment".  It is pure opinion as to what the State did "wisely" under its "strategy".  Complaint

13   at ¶ 42; *see Heller v. NBCUniversal, Inc.*, 2016 U.S. Dist. LEXIS 193316, at *20 (C.D. Cal.

14   June 29, 2016) (a "comment is mere opinion shielded from liability" in defamation.)

15          Again, in Paragraph 45, Plaintiff quotes a large section of the Cameron Article without

16   specifying which part he specifically claims is false.  As discussed above, whether something is

17   a "scam" or "fake diagnosis" is a protected statement of opinion based on disclosed fact.  In

18   Paragraphs 47-48, Plaintiff takes issue with the statement that he is "not a 'recognized

19   leader'".[34]  But this kind of statement is precisely the type of unprovable opinion that cannot

20   give rise to liability.  And, it is based on the disclosed fact—Dr. Feder, whose expertise was

21   published in the New England Journal of Medicine, specifically disputed Dr. Cameron's

22   practice, indicating he does not view Plaintiff as a recognized leader.  *See* Exhibit 1.

23          Finally, in Paragraph 63, Dr. Cameron realleges that the assertions of being a "scam"

24   and that the charges were "uncontested" constitute actual malice.  However, as set forth above,

---

[34] This assertion highlights Plaintiff's admission that he is a public figure, subject to the actual malice standard.

1  "scam" is protected opinion based on disclosed facts and the charges were "uncontested" in the

2  Consent Agreement and as admitted to this Court.

3  **3.5  The Articles are Privileged as a Fair Report**

4  Under N.Y. Civ. Rights Law § 74, no libel action can be maintained "for the publication

5  of a fair and true report of any…official proceeding[.]"  The articles here are reports of the

6  official proceedings of the State Board of Public Health.  Importantly, "[t]he section 74

7  privilege is absolute and is not defeated by allegations of malice or bad faith."  *Fuji Photo Film*

8  *U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009).

9  "For a report to be 'fair and true' within the meaning of § 74, it is enough that the

10  substance of the article be substantially accurate."  *Wenz v. Becker*, 948 F. Supp. 319, 324

11  (S.D.N.Y. 1996).  The challenged language of the headline and article of an official proceeding

12  … 'should not be dissected and analyzed with a lexicographer's precision.'"  *Idema v. Wager*,

13  120 F. Supp. 2d 361, 369 (S.D.N.Y. 2000) quoting *Becher v. Troy Publ'g Co., Inc.*, 183 A.D.2d

14  230, 234, 589 N.Y.S.2d 644, 646 (3rd Dept. 1992).  The articles are substantially accurate, and

15  Plaintiff's claims of falsity simply peck at the edges.

16  Similarly, under Florida law, a report "need not describe legal proceedings in technically

17  precise language. … [Reporters have] a qualified privilege to report accurately on information

18  received from government officials. The privilege extends to the publication of the contents of

19  official documents, as long as the account is reasonably accurate and fair."  *Rasmussen v.*

20  *Collier Cty. Publ'g Co.*, 946 So. 2d 567, 570-71 (Fla. Dist. Ct. App. 2006). Under Connecticut

21  law, the articles are privileged as "a fair and accurate report of judicial and official proceedings"

22  and "fair comment on a matter of public interest." *Miller v. News Syndicate Co.*, 445 F.2d 356,

23  357-58 (2d Cir. 1971). Thus, the fair report privilege precludes this action.

24  **4.0  CONCLUSION**

25  Dr. Cameron does not like the publicity given to the disciplinary action by Attorney

26  Bellamy.  But, his untimely suit, against a Section 230-protected defendant, over an article that

27

28

1    is substantially true and a fair report of the Board's proceedings, interspersed with commentary,

2    is not the proper response.

3           Dr. Cameron apparently intends to make this case about trying to prove to a jury, instead

4    of the scientific community, that his treatments are valid, and to silence lawful criticism.

5    Scientific debate should be left to develop organically--whether he likes the results or not. The

6    Complaint should be dismissed and Dr. Novella should be awarded his reasonable fees.

7

8

9

10          Dated January 8, 2019.                Respectfully submitted,
11                                                 /s/ *Jay M. Wolman*
                                                   Jay M. Wolman (JW0600)
12                                                 RANDAZZA LEGAL GROUP, PLLC
                                                   100 Pearl Street, 14th Floor
13                                                 Hartford, CT 06103
                                                   Tel:    702-420-2001
14                                                 Email: ecf@randazza.com
15
                                                   Marc J. Randazza, *pro hac vice forthcoming*
16                                                 RANDAZZA LEGAL GROUP, PLLC
                                                   2764 Lake Sahara Drive, Ste. 109
17                                                 Las Vegas, NV 89117
                                                   Tel:    702-420-2001
18                                                 Email: ecf@randazza.com
19
                                                   *Attorneys for Defendant,*
20                                                 *Steven Novella, M.D.*
21

22

23

24

25

26

27                                           - 25 -
28

1                                                  CASE NO.:  7:18-CV-10395 (VB)

2                    **<u>CERTIFICATE OF SERVICE</u>**

3      I HEREBY CERTIFY that on January 8, 2019, I electronically filed the foregoing

4 document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy

5 of the foregoing document is being served via transmission of Notices of Electronic Filing

6 generated by CM/ECF.

7

8                                          Respectfully submitted,

9

10                                          /s/ *Jay M. Wolman*
                                         Jay M. Wolman (JW0600)
                                         Randazza Legal Group, PLLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                   - 26 -

28